NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TRAVEL SENTRY, INC.,**
*Plaintiff-Cross Appellant,*

v.

**DAVID A. TROPP,**
*Defendant-Appellant.*

---

2011-1023, -1367

---

Appeals from the United States District Court for the Eastern District of New York in Case No. 06-CV-6415, Judge Eric N. Vitaliano.

---

Decided: November 5, 2012

---

WILLIAM L. PRICKETT, Seyfarth Shaw LLP, of Boston, Massachusetts, argued for plaintiff-cross appellant.

DONALD R. DINAN, Roetzel & Andress, LPA, of Washington, DC, argued for defendant-appellant.

---

Before LOURIE, LINN, and MOORE, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LOURIE, in which *Circuit Judge* MOORE joins.  Opinion concurring in part filed by *Circuit Judge* LINN.

LOURIE, *Circuit Judge.*

David A. Tropp ("Tropp") appeals from the decision of the United States District Court for the Eastern District of New York granting summary judgment that Travel Sentry, Inc. ("Travel Sentry") does not infringe the asserted claims of Tropp's U.S. Patents 7,021,537 and 7,036,728 (the "'537 patent" and "'728 patent").  *Travel Sentry, Inc. v. Tropp*, 736 F. Supp. 2d 623, 639 (E.D.N.Y. 2010).  Travel Sentry cross-appeals from the court's denial of its claim for attorney fees and costs.  *Travel Sentry, Inc. v. Tropp*, No. 06-CV-6415, 2011 WL 1327134, at *2 (E.D.N.Y. Mar. 31, 2011).  We *vacate* the court's grant of summary judgment and the order denying Travel Sentry's claim for fees.  We *remand* for further proceedings.

## BACKGROUND

The terrorist attacks of September 11, 2001, have led to a heightened concern for air travel security.  That concern is addressed in part by the Transportation Security Administration ("TSA") of the Department of Homeland Security ("DHS"), which conducts airline luggage inspections and is the sole luggage screening entity in the United States.  Pursuant to a Congressional mandate (the "Screening Mandate") adopted in response to the terrorist attacks, TSA instituted a policy on January 1, 2003, of screening all checked airline luggage for flights originating in the United States.  *Travel Sentry*, 736 F. Supp. 2d at 626.  In announcing the new policy, TSA advised travelers to leave their checked luggage unlocked.  TSA warned that its agents would otherwise break the locks on locked bags in order to open and inspect them.

The '537 and '728 patents are both entitled "Method of Improving Airline Luggage Inspection." Tropp is the sole named inventor and owner of the patents, which claim a filing date of November 12, 2003.[1] Tropp's patents disclose an improved method of airline luggage screening using a dual-access lock. The lock enables a traveler to secure his or her luggage while still permitting it to be accessed by a luggage screening entity with a master key. *Id.* at 624. According to the patents, Tropp's invention addresses "a compelling and immediate need" for a method of inspecting luggage that does not create security risks associated with unlocked baggage and does not damage luggage or aggravate passengers. '537 patent col.2 ll.21–24.

Tropp's patents claim methods involving the steps of (1) providing to consumers a "special" dual-access luggage lock having an "identifying structure," (2) marketing the special lock to consumers, (3) the identification structure signaling to a luggage screener that the lock may be opened with a master key, and (4) the luggage screener using the master key to open the lock. Claim 1 of the '537 patent is representative:

> 1. A method of improving airline luggage inspection by a luggage screening entity, comprising:
>
> [Step 1] making available to consumers a special lock having a combination lock portion and a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock, the special

---

[1]    The '728 patent is a continuation-in-part of two patent applications, including one that was filed on November 12, 2003, and issued as the '537 patent.

lock designed to be applied to an individual piece of airline luggage, the special lock also having an identification structure associated therewith that matches an identification structure previously provided to the luggage screening entity, which special lock the luggage screening entity has agreed to process in accordance with a special procedure,

[Step 2] marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the luggage screening entity to the special procedure,

[Step 3] the identification structure signaling to a luggage screener of the luggage screening entity who is screening luggage that the luggage screening entity has agreed to subject the special lock associated with the identification structure to the special procedure and that the luggage screening entity has a master key that opens the special lock, and

[Step 4] the luggage screening entity acting pursuant to a prior agreement to look for the identification structure while screening luggage and, upon finding said identification structure on an individual piece of luggage, to use the master key previously provided to the luggage screening entity to, if necessary, open the individual piece of luggage.

*Id.* col.6 ll.6–37.

Tropp, through his company Safe Skies, LLC, administers a lock system that permits TSA to unlock, inspect, and relock checked baggage. Tropp asserts that he conceived of his method of airline luggage inspection upon reading about the Screening Mandate in December of 2002. *Travel Sentry*, 736 F. Supp. 2d at 630. Tropp twice contacted TSA in early 2003, proposing an agreement to implement his method. *Id.* TSA informed Tropp that his proposal did not meet the TSA lock standards then in effect. *Id.* Shortly after Tropp filed his patent application in November 2003, however, TSA notified Tropp that it would recognize his system. *Id.* at 631. In 2005, Tropp incorporated Safe Skies, LLC, and began selling locks marked with a red flame logo. Safe Skies sells its locks online, by mail order, and to large retailers. Safe Skies and TSA entered into a memorandum of understanding pursuant to which Safe Skies provides TSA with training materials regarding lock recognition and master keys to open Safe Skies' locks, and TSA agrees, whenever practicable, to open checked baggage secured with Safe Skies' locks using the master keys. J.A. 852.

Travel Sentry also administers a system that enables a traveler to lock a checked bag while allowing the TSA to open the lock, search the bag as needed, and then relock it. *Travel Sentry*, 736 F. Supp. 2d at 627. The identifying mark on Travel Sentry's locks is a red diamond logo, for which Travel Sentry holds a registered trademark. *Id.* at 630. Under the terms of Travel Sentry's "Trademark License Agreement," lock manufacturers pay Travel Sentry an initial fee and subsequent royalties for each lock bearing the red diamond logo that they sell to distributors, as well as an annual fee and a fee for the master keys provided to TSA. *Id.* Under Travel Sentry's "Marketing License Agreement," lock distributors pay Travel Sentry an annual fee for the right to market a

capped number of marked locks. *Id.* Under Travel Sentry's Limited Distribution Letter of Agreement, certain luggage manufacturers pay Travel Sentry an annual fee and royalties for each marked lock used in their luggage. *Id.* Travel Sentry's website provides an explanation to consumers about how the concept works and identifies websites and stores where Travel Sentry-marked products can be purchased. *Id.* Travel Sentry retains the right to monitor the quality of the locks bearing its mark and to control the distribution of master keys, which have a distinctive shape and color. *Id.*

Travel Sentry entered into a three-page Memorandum of Understanding ("MOU") with TSA in October 2003. *Id.* at 628–30; *see also* J.A. 322–24. The MOU, which is quoted at length in the district court opinion, is the only written agreement between TSA and Travel Sentry concerning Travel Sentry-marked locks. *Travel Sentry*, 736 F. Supp. 2d at 628. The MOU states that Travel Sentry will supply TSA with master keys (termed "passkeys") to open checked baggage secured with Travel Sentry-certified locks. According to the MOU, the purpose of the agreement:

is to set forth terms by which Travel Sentry will provide TSA, at no cost, with 1,500 complete sets of passkeys for the TSA to distribute to field locations. These passkeys are designed to permit TSA screeners to open checked baggage secured with Travel Sentry certified locks without breaking such locks.

TSA will test these passkeys to ensure their operational suitability. If TSA determines that Travel Sentry certified locks or the passkeys required for their operation do not perform their intended function, TSA will inform Travel Sentry

and this agreement will be considered null and void. TSA takes no responsibility for any damage to locks or baggage secured with Travel Sentry locks, although TSA will make good faith efforts to distribute the passkeys and information provided by Travel Sentry on the use of the passkeys, and to use the passkeys to open checked baggage secured with Travel Sentry certified locks whenever practicable. TSA screeners will make good faith efforts to relock Travel Sentry locks after bags are inspected.

*Id.* at 628–29.

The MOU sets forth the responsibilities of both parties to the agreement. With respect to the TSA, the MOU provides that:

(a) TSA will accept passkey sets, as well as backup replacement sets, from Travel Sentry and distribute the sets to all areas where baggage is being screened;

(b) the passkeys will be stamped "Property of TSA" and "Unlawful to Duplicate," "may include the DHS logo if desired and authorized," and will be marked with a tracking number in a TSA-agreed format so that they "can be easily integrated into the TSA property management system;"

(c) Travel Sentry will coordinate the content of public announcement with the TSA in advance of the program launch, tentatively scheduled for November 12, 2003, "including promotional materials, press releases and similar media;" and

(d) "TSA may offer the same terms and conditions in this agreement to any other entity that seeks to provide similar services."

*Id.* at 629. With regard to Travel Sentry's responsibilities, the MOU states that:

(a) "Travel Sentry acknowledges that the TSA cannot make or infer any exclusive endorsement of Travel Sentry certified locks, nor can Travel Sentry claim that any such endorsement exists. Travel Sentry may not use the DHS/TSA logo on any of its locks or distributed print or other media materials unless specifically authorized to do so in writing;"

(b) "Travel Sentry understands that the TSA intends to develop a functional standard, open to the public, for 'Independent Dual Custody Operation Locking Systems.' By moving ahead with its program in advance of the publication and adoption of this standard, Travel Sentry or any other entity takes some degree of risk in that their locking system may not meet the final version of the functional standard;" and

(c) "Travel Sentry will provide TSA with all necessary screener training materials, in sufficient quantities, on lock recognition, use of passkeys to open locks and ordering of replacement or additional sets of passkeys. Travel Sentry will work with TSA in ensuring distribution of training materials to all checked baggage screening sites."

*Id.* Finally, the MOU states that its terms will remain in effect until terminated, and that either party may terminate the MOU upon 30 days' notice to the other party. *Id.* at 630.

In December 2006, Travel Sentry sued Tropp seeking a declaratory judgment of noninfringement and invalidity of the '537 and '728 patents, and Tropp subsequently counterclaimed for infringement.[2] *Id.* at 624. In September 2009, following a *Markman* hearing, the district court issued an opinion construing the disputed claim terms. *Travel Sentry, Inc. v. Tropp*, 661 F. Supp. 2d 280 (E.D.N.Y. 2009). Travel Sentry then moved for summary judgment of noninfringement.

In an opinion dated September 10, 2010, the district court granted Travel Sentry's motion for summary judgment of noninfringement. *Travel Sentry*, 736 F. Supp. 2d at 624. The court began by summarizing the significance of the four steps of the asserted method claims.[3] The court explained that "the first and second steps of the method[] describe the actions of 'making available' and 'marketing' locks to customers, without specifying that those actions are to be performed by any particular type of person or entity." *Id.* at 637. The court further observed that "[t]he third and fourth [steps of the method] specifically describe actions to be taken by a luggage screening entity in the course of performing luggage screening (recognizing a signal denoting a special lock,

---

[2] In November 2008, Tropp commenced a related action, claiming infringement of the '537 and '728 patents by eighteen luggage manufacturers and/or distributors who have licensed Travel Sentry's trademark. *Travel Sentry*, 736 F. Supp. 2d at 624 & n.1. That action is not before us in this appeal.

[3] Before the district court, Travel Sentry contended that the asserted claims contained four steps, whereas Tropp asserted that they contained only two. Arguably they contain three steps, that labeled above as step 3 in fact being not a step of a method but a whereas-type clause. On appeal, as Tropp acquiesces in the district court's conclusion that the methods contain four steps, we will also.

and looking for and opening locks with that signal with a master key)." *Id.*

The district court then considered the matter of direct infringement. As to the first two steps of the claimed method, the court "assum[ed] *arguendo* that Tropp has demonstrated a material question of fact as to whether Travel Sentry performs and/or directs or controls its licensee[s]' performance of each of those two steps, either literally or under the doctrine of equivalents." *Id.* at 638. The court then observed that Tropp's "direct infringement claim against Travel Sentry is only viable if there is sufficient evidence to permit a reasonable jury to infer that Travel Sentry directs and controls the TSA's performance of the additional steps of the method." *Id.* Focusing its analysis on steps 3 and 4 of Tropp's claimed method, the district court held that the MOU "is insufficient to establish the 'control or direction' requirement for joint infringement liability established by the Federal Circuit in *BMC Resources* and *Muniauction.*" *Id.* (citing *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008); *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), *overruled on other grounds by Akamai Techs. Co. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (en banc)). As the district court explained, "Tropp points to no evidence at all that could morph this relatively noncommittal 'understanding' between Travel Sentry and the TSA into a contract that renders Travel Sentry vicariously liable for the TSA's actions." *Id.* The court thus concluded that Travel Sentry did not directly infringe the method claims under a theory of joint infringement.

The district court then turned to the matter of indirect infringement. In view of its holding of no direct infringement, the court concluded that, "in the absence of a showing that any entity has directly infringed Tropp's

patents, any claim by him against Travel Sentry for indirect infringement fails as a matter of law." *Id.* at 639 (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004)). On that basis the district court found no genuine issue of material fact that Travel Sentry did not indirectly infringe Tropp's asserted claims.

The district court entered summary judgment of non-infringement in favor of Travel Sentry and dismissed the action with prejudice. *Id.* The court subsequently denied a motion by Travel Sentry for attorney fees and costs pursuant to 35 U.S.C. § 285 and 28 U.S.C. § 1927, and closed the case. *Travel Sentry*, 2011 WL 1327134, at *2.

Tropp appealed from the grant of summary judgment of noninfringement, and Travel Sentry cross-appealed from the denial of its motion for fees and costs. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review *de novo* a district court's grant of summary judgment, drawing all reasonable inferences in favor of the nonmovant." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Infringement is a question of fact. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011). "On appeal from a grant of summary judgment of non-infringement, we determine whether, after resolving reasonable factual inferences in favor of the

patentee, the district court correctly concluded that no reasonable jury could find infringement." *Id.* at 1130.

On appeal, Tropp asserts that the district court erroneously granted summary judgment of noninfringement. Tropp contends that Travel Sentry, by directing and controlling third parties' actions, infringes the asserted claims. Tropp argues that Travel Sentry directs and controls its manufacturer licensees and distributor licensees to perform steps 1 and 2 of the asserted claims. Tropp further asserts that Travel Sentry directs and controls TSA in its performance of steps 3 and 4. Tropp contends that TSA, pursuant to the MOU, specifically agreed to use the Travel Sentry system. Further, Tropp argues, TSA in fact uses the Travel Sentry system, as a notice on TSA's website indicates. *See* J.A. 447. In arguing that Travel Sentry directs and controls TSA in its performance of claim steps 3 and 4, Tropp points out that under the MOU: (1) Travel Sentry supplies TSA with master keys and replacement keys designed to permit TSA screeners to open checked baggage secured with Travel Sentry-certified locks; (2) the TSA commits to make "good faith efforts" to distribute the passkeys to its screeners and to use them to unlock and relock Travel Sentry-certified locks; (3) Travel Sentry and TSA coordinate public announcements concerning the program; (4) Travel Sentry provides screener training materials to TSA and works with TSA to ensure distribution of those materials to all screening sites; and (5) Travel Sentry agrees to assume liability for luggage damaged by TSA. The relationship between Travel Sentry and TSA, Tropp argues, amounts to direction and control such that summary judgment of noninfringement should not have been granted.

Travel Sentry, in response, contends that Tropp has presented no evidence that Travel Sentry directs or

controls the performance of any steps of the asserted claims. As for method steps 1 and 2, Travel Sentry contends that the record is devoid of evidence that Travel Sentry controls the relevant actions of any other parties, including manufacturers of locks, retailers of locks, or consumers. Regarding steps 3 and 4, Travel Sentry asserts that it does not direct or control TSA. According to Travel Sentry, although the MOU suggests that TSA may open Travel Sentry-marked locks with master keys, the MOU makes clear that TSA is not obligated to do anything for Travel Sentry. Travel Sentry argues that, at most, TSA represented that it would make "good faith efforts," when practicable, to use the master keys to open and relock checked baggage secured with Travel Sentry-marked locks. Moreover, according to Travel Sentry, the MOU does not set forth any consequence or remedy for either party's failure to comply with its terms, and it allows either party to unilaterally terminate the agreement. Travel Sentry points out that TSA's screening procedures are classified, *see* 49 C.F.R. § 1520.5(b)(9), and that TSA maintains complete discretion over whether, how, where, and when it performs the luggage screening steps. Because the MOU does not require the TSA to take any action, Travel Sentry asserts, it does not in any way support the requisite direction or control for a finding of joint infringement. Finally, Travel Sentry contends that it cannot be liable for either contributory infringement or inducement because no party engages in direct infringement, *i.e.*, performs or controls the performance of each step of the claimed methods.

To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed. *BMC*, 498 F.3d at 1378; *Muniauction*, 532 F.3d at 1328. In cases in which

more than one entity performs the steps of a claimed method or process, a party is liable for direct infringement only if that party exercises "control or direction" over the performance of each step of the claim, including those that the party does not itself perform. *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1381 (Fed. Cir. 2010) ("Where the combined actions of multiple parties are alleged to infringe process claims, the patent holder must prove that one party exercised control or direction over the entire process such that all steps of the process can be attributed to the controlling party, i.e., the mastermind." (internal quotation marks omitted)); *see also Muniauction*, 532 F.3d at 1329; *BMC*, 498 F.3d at 1380 ("Courts faced with a divided infringement theory have also generally refused to find liability where one party did not control or direct each step of the patented process."). The determination is a fact-specific inquiry; relevant considerations include whether the accused direct infringer "provides instructions or directions" to another entity for performing steps of the patented process or, on the other hand, "contract[s] out steps of a patented process to another entity." *BMC*, 498 F.3d at 1381. Alternatively, "the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Muniauction*, 532 F.3d at 1330.

In the recent *en banc* decision of this court in *Akamai*, we decided an issue of divided infringement under § 271(b), rather than under 271(a). *Akamai*, 692 F.3d at 1307. We found that "we have no occasion at this time to revisit any of those principles regarding the law of divided infringement as it applies to liability for direct infringement under 35 U.S.C. § 271(a)." *Id.* We therefore left

open to possible future cases whether some form of liability for divided infringement could occur in some circumstances under § 271(a). While a reasonable fact-finder could in some circumstances find that direction could be separated from control and lead to infringement liability, such circumstances have not found their way into our precedent at the present time. We therefore will review this appeal under the rubric of induced infringement.

Thus, as our precedent now stands, on the issue of direct infringement under § 271(a), we agree with the district court that there is no genuine issue of material fact that Travel Sentry does not control or direct the performance of each step of the claimed method. Like the district court, we focus our analysis on steps 3 and 4 of Tropp's claimed method. *See Travel Sentry*, 736 F. Supp. 2d at 638. If the performance of those steps is not attributable to Travel Sentry, then Travel Sentry cannot be directly liable for infringing Tropp's asserted method claims. The parties do agree that steps 3 and 4 of Tropp's claimed method can only be performed by a baggage screening entity—*i.e.*, TSA. In addition, Travel Sentry does not seriously dispute that it is TSA who performs those steps independently. The inquiry, then, is whether there is sufficient evidence that Travel Sentry controls or directs TSA in its performance of those steps, such that Travel Sentry is liable for TSA's acts.

In performing its direct infringement analysis, the district court correctly scrutinized the MOU, the only written agreement between Travel Sentry and TSA. *Id.* at 628. It correctly concluded that it is clear from the MOU that Travel Sentry neither controls nor directs TSA's performance of steps 3 and 4 of the asserted claims. For example, there is nothing in the MOU to suggest that Travel Sentry exerts control over TSA, as TSA remains free to decide in the course of its screening whether or not

it will use the master keys to open a Travel Sentry-certified lock. *Id.* at 638. As the district court correctly observed, the MOU "does not provide for any consequences of a failure to comply, and either party can unilaterally terminate it at will." *Id.* Likewise, Travel Sentry also does not direct TSA in its performance of steps 3 and 4. As we explained in *Muniauction*, an accused infringer that merely "controls access to its system and instructs [others] on its use" is not liable for direct infringement. 532 F.3d at 1330. Travel Sentry's actions pursuant to the MOU amount to no more than that. Tropp makes no attempt to distinguish the instructions at issue in *Muniauction* from the MOU's provision stating that "Travel Sentry will provide TSA with all necessary screener training materials." *Travel Sentry*, 736 F. Supp. 2d at 629. As a result, Tropp fails to refute the district court's determination that the relationship between Travel Sentry and TSA "is precisely the type of relationship which the Federal Circuit in *Muniauction* deemed inadequate to support a claim of direct infringement." *Id.* at 638. Accordingly, we, like the district court, reject Tropp's assertion of a genuine dispute that Travel Sentry controls or directs TSA in a way that would give rise to direct infringement liability. *Id.*

Tropp characterizes the MOU as a "contract," but that inapt description fails to acknowledge the nonbinding, nonexclusive nature of the MOU, which indicates that TSA will make only "good faith efforts" to use the Travel Sentry system "whenever practicable," and provides no remedy for a decision by TSA not to use Travel Sentry's master keys to open Travel Sentry-marked locks. *Id.* at 629. Tropp also contends that, because the MOU states that "TSA takes no responsibility for any damage to locks or baggage secured with Travel Sentry locks," Travel Sentry must be vicariously liable for TSA's acts. Al-

though the control or direction standard is satisfied where the accused direct infringer is vicariously liable for the actions of a third party who completes performance of the claimed method, that does not describe the situation here. The terms of the MOU do not contain any express or implicit agreement that TSA will act on Travel Sentry's behalf or subject to its control, as an agency relationship would require. *See Dixson v. United States*, 465 U.S. 482, 505 (1984) ("[An] agency relationship [is] created when one person agrees with another 'that the other shall act on his behalf and subject to his control.'" (quoting Restatement (Second) of Agency § 1 (1957))). There is no genuine factual dispute that Travel Sentry is not vicariously liable for TSA's actions.

Accordingly, we conclude that the district court did not err by finding no genuine issue of material fact that Travel Sentry is not liable for direct infringement of Tropp's asserted claims. *See Travel Sentry*, 736 F. Supp. 2d at 639. That does not end our analysis, however, because the district court's grant of summary judgment also rested on its determination that Travel Sentry could not be liable for indirect infringement. *Id.* At 634-35, 639.

With respect to inducement under § 271(b), we conclude that the district court legally erred in its analysis of indirect infringement. *Travel Sentry*, 736 F. Supp. 2d at 634–35, 639. Recently, sitting *en banc* in *Akamai*, we clarified the law on inducement. We explained that all the steps of a claimed method must be performed in order to find induced infringement, but that it is not necessary to prove that all the steps were committed by a single entity. *Akamai*, 692 F.3d at 1307. In so holding, we overruled the holding in *BMC* that in order for a party to be liable for induced infringement, some other entity must be liable for direct infringement. *Id.*

Travel Sentry's reliance on *BMC* in support of the district court's conclusion on indirect infringement is, accordingly, unpersuasive. The district court summarily concluded that because a single party was not liable for direct infringement, "any claim by [Tropp] against Travel Sentry for indirect infringement fails as a matter of law." *Travel Sentry*, 736 F. Supp. 2d at 639. As we explained in *Akamai*, however, our prior cases do not support a single-entity requirement in the inducement context. *Akamai*, 692 F.3d at 1315. Rather, liability under § 271(b) may arise when the steps of a method claim are performed by more than one entity, provided the other requirements for inducement are met. *Id.* at 1306.

The district court, although following our then-existing precedent, erred by founding its indirect infringement analysis on a single-entity requirement. *See id.* at 1318. The district court did not determine whether a genuine issue of material fact existed as to the performance of all the claim steps—whether by one entity or several. Moreover, the court did not analyze whether Travel Sentry had knowledge of Tropp's patent and induced others to perform the claim steps that Travel Sentry did not itself perform.

We therefore vacate the district court's grant of summary judgment and remand for a determination whether, under the standard set forth in our recent *en banc* opinion in *Akamai*, Travel Sentry is liable for indirect infringement. That standard requires that the accused inducer, here, Travel Sentry, knew of the asserted patents and performed or induced the performance of the steps of the claimed methods, and that all of those steps were in fact performed.

## II

In view of our disposition of the merits of Tropp's appeal, we need not address Travel Sentry's cross-appeal from the court's denial of its claim for fees and costs under 35 U.S.C. § 285 and 28 U.S.C. § 1927. We therefore vacate the district court's denial of Travel Sentry's motion for fees and costs. *See Raytheon Co. v. Indigo Sys. Corp.*, No. 2011-1245, 2012 WL 3104602, at *1 n.1 (Fed. Cir. Aug. 1, 2012).

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment and its order denying Travel Sentry's motion for fees and costs are vacated. The case is remanded for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TRAVEL SENTRY, INC.**,
*Plaintiff-Cross Appellant,*

**v.**

**DAVID A. TROPP**,
*Defendant- Appellant.*

---

2011-1023, -1367

---

Appeal from the United States District Court for the Eastern District of New York in No. 06-CV-6415, Judge Eric N. Vitaliano.

---

LINN, *Circuit Judge*, concurring-in-part.

I agree with the majority in all respects but one. Where I part company is with the majority's suggestions that the "direction or control" standard is an alternative to and therefore different from the traditional principles of vicarious liability and that circumstances may exist in which "direction" could be separated form "control." Maj. Op. 14-15. These suggestions fly in the face of *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (en banc), and this court's other

precedents and amount to no more than obiter dictum, unnecessary to resolve the case presently before us.

The majority's suggestions are contrary to the test for divided infringement liability under 35 U.S.C. § 271(a) established in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007) and *Muniauction, Inc. v. Thomson Corp*, 532 F.3d 1318 (Fed. Cir. 2008). The question of when liability arises for divided infringement under § 271(a) was recently before the court sitting en banc in *Akamai*, and a majority of this court's active judges expressly declined to alter the standard for direct infringement established by *BMC* and *Muniauction*. *Akamai*, 692 F.3d at 1307. To suggest that *Akamai* "left open to possible future cases whether some form of liability for divided infringement could occur in some circumstances under § 271(a)," Maj. Op. 14-15, unnecessarily provokes continued debate and uncertainty in an area of the law now settled by the court.

The majority's assertion that the traditional principles of vicarious liability are an alternative way to meet the direction or control standard, suggesting that the direction or control standard is broader than the traditional principles of vicarious liability, is not supported by this court's precedent. *See id.* 14 ("*Alternatively*, 'the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method.'" (emphasis added) (quoting *Muniauction*, 532 F.3d at 1330)). This court has repeatedly equated direction or control with the traditional principles of vicarious liability, such as agency, and has done so most recently in *Akamai*:

This court has held that for a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to infringe the patent, either personally or vicariously. In the context of a method claim, that means the accused infringer must perform all the steps of the claimed method, either personally or through another acting under his *direction or control. . . .*

To be sure, the court has recognized that direct infringement applies when the acts of infringement are committed by an agent of the accused infringer or a party acting pursuant to the accused infringer's direction or control. *Absent an agency relationship between the actors or some equivalent, however, a party that does not commit all the acts necessary to constitute infringement has not been held liable for direct infringement* even if the parties have arranged to "divide" their acts of infringing conduct for the specific purpose of avoiding infringement liability.

692 F.3d at 1307 (emphasis added) (citations omitted). The holding of *Muniauction* similarly recognized the relationship between the traditional principles of vicarious liability and the direction or control test:

Under *BMC Resources,* the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method. In this case, Thomson neither performed every step of the claimed methods nor had another party perform steps on its behalf, and Muniauction has identified no legal theory under which Thomson might

be vicariously liable for the actions of the bidders. Therefore, Thomson does not infringe the asserted claims as a matter of law.

*Muniauction*, 532 F.3d at 1330 (citations omitted).

The direction or control test determines when one party "bears *responsibility* for the actions of the other," *BMC*, 498 F.3d at 1382 (emphasis added), or when the steps performed by another are "*attributable* to the controlling party," *Muniauction*, 532 F.3d at 1329 (emphasis added). The traditional principles of vicarious liability, which are well established in the context of tort and agency law, govern when liability arises for the acts of another. *See* Restatement (Third) of Agency § 1.01 (2006); Restatement (Second) of Torts § 877 (1979); Restatement (Second) of Torts § 315 (1965). To find one party liable for the actions of another independent of the traditional principles of vicarious liability would essentially hold a party liable for practicing only a portion of the claim, and thus derogate from the general principle that "[i]nfringement requires, as it always has, a showing that a defendant has practiced each and every element of the claimed invention." *BMC*, 498 F.3d at 1380 (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)); *see also Muniauction*, 532 F.3d at 1329 ("The court's analysis [in *BMC*] was founded on the proposition that direct infringement requires a single party to perform every step of a claimed method."). As this court explained in *Akamai*, while a single entity can directly infringe a patent by performing all of the steps of a method "either personally or vicariously," direct infringement is a strict liability tort and "has not been extended to cases in which multiple independent parties perform the steps of the method claim." 692 F.3d at 1307. This is because to do so would "ensnare actors who did not themselves commit all the acts necessary to constitute infringement and who had no way of knowing that others

were acting in a way that rendered their collective conduct infringing." *Id.* The majority's suggestion that the traditional principles of vicarious liability are not the only way to show direction or control is contrary to the single entity rule and the all elements rule, and would allow independent parties to be held strictly liable for an infringement that none of them individually commits.

The majority's proposed separation of direction from control is contrary to this court's precedent. *Muniauction*, 532 F.3d at 1330 (treating "control or direction" as a single standard met "where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method"). Nonetheless, the majority invites a "reasonable fact-finder" to draw such a distinction and separately discusses direction and control in its analysis. Maj. Op. 15-16. The majority's *sub silentio* separation of direction and control in its analysis is both inappropriate and uncalled for, as the majority's speculation on this settled standard is unnecessary to resolve the case presently before this court.